**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHIRLEY GILYARD,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>ADAM'S EUROPEAN CONTRACTING, INC. and EJAZ CHATTHA,<br><br>　　　　　　Defendants. | Index No.:<br><br>**COMPLAINT** |

Plaintiff Shirley Gilyard, by her undersigned attorneys, alleges as follows, based upon personal knowledge with respect to herself and upon information and belief with respect to all other matters.

NATURE OF THE ACTION

1.　　Plaintiff Shirley Gilyard brings this action against Defendants Adam's European Contracting, Inc. and Ejaz Chattha to seek redress violations of the Civil Rights Act of 1866 ("CRA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), New York State Human Rights Law, N.Y. Executive Law §§ 290 et seq. ("NYSHRL"), and the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 et seq. ("NYCHRL").

2.　　Plaintiff seeks declaratory, injunctive, punitive, and monetary relief to redress Defendants' unlawful employment practices, including unlawful discrimination against Plaintiff because of her race, gender, and sexual orientation.

ADMINISTRATIVE PROCEDURES

3.　　Following commencement of this action, a copy of this Complaint will be served to Defendants in compliance with all applicable laws.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over Ms. Gilyard's claims pursuant to 28 U.S.C. § 1331 because the claims arise under federal laws 42 U.S.C. § 2000e and 42 U.S.C. § 1981. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because it involves the same case and controversy as the federal law claims.

5. Venue is proper because pursuant to 28 U.S.C. § 1391(b) because the Eastern District of New York is the district in which the events that gave rise to the claim occurred.

## PARTIES

6. Plaintiff Shirley Gilyard ("Ms. Gilyard) is a New York resident.

7. Ms. Gilyard is a Black woman who identifies as a lesbian.

8. Ms. Gilyard resides at 195 Hoyt Street Apt 5B, 11217, her telephone number is (347) 706-7671.

9. Defendant Adam's European Contracting, Inc., ("Adam's European") is a general contracting construction company that frequently does work for public agencies of New York City.

10. Adam's European meets the definition of an "employer" under all applicable statutes.

11. Adam's European's business address is 589 Johnson Avenue, Brooklyn, NY 11237.

12. Upon information and belief, Defendant Ejaz Chattha ("Mr. Chattha") is employed by Adam's European as a Project Manager.

13. Ms. Gilyard is a member of the union Roofers Local 8.

14. Ms. Gilyard is employed by Adam's European as a grounds cleaner.

## STATEMENT OF FACTS

15. Ms. Gilyard is a 65-year old Black lesbian woman.

16. Ms. Gilyard is trained as a roofer and belongs to the union Roofers Local 8.

17. Ms. Gilyard lives in Gowanus Houses, where Adam's European was undertaking a construction job starting in 2018.

18. Adam's European hired Ms. Gilyard in August 2018 under Section 3 of the Housing and Development Act of 1968 ("Section 3"). Section 3 is a federal program that provides funding to states and cities in order to provide employment to low-income individuals. Such individuals who live in the communities and buildings where work is being done are prioritized in the hiring process.

19. Ms. Gilyard worked for Adam's European at the Gowanus location from August 2018 until March 2020, at which time she was transferred to another construction project in Red Hook, where Ms. Gilyard has worked ever since.

20. Ms. Gilyard's duties mainly include keeping the grounds clean at the construction site. She now cleans the entirety of the Red Hook Public Housing grounds, often by herself. Red Hook Houses is the biggest public housing complex in Brooklyn. She travels from the "East" side of the housing to the "West" side to clean. She has also cleaned the waste produced by Adam's European's construction projects.

21. At the start of her employment, Adam's European placed Ms. Gilyard under the supervision of Mr. Chattha at the Gowanus construction project.

22. Upon information and belief, Mr. Chattha is a project manager for Adam's European.

*Events at the Gowanus Housing Work Site, August 2018 - March 2020*

23. From the first moment that Ms. Gilyard began working under Mr. Chattha, Mr. Chattha has treated her with blatant disrespect and hostility.

24. Mr. Chattha has consistently used abusive and derogatory language toward Ms. Gilyard and spoken to her in a hostile, derisive tone on a daily basis.

25. Mr. Chattha's behavior has caused Ms. Gilyard severe emotional distress.

26. Frequently, Mr. Chattha's derogatory remarks either directly or indirectly referenced Ms. Gilyard's race, gender, and sexual orientation.

27. Such behavior began as soon as Ms. Gilyard began working for Adam's European and continued slightly past her date of transfer to Red Hook Housing Projects, around March of 2020. The events described in paragraphs 28-102, unless otherwise stated, occurred between Ms. Gilyard's first day

working for Adam's European in August 2018 and Ms. Gilyard's date of transfer on or about March 20, 2020.

28. Mr. Chattha's discriminatory conduct occurred so regularly that Ms. Gilyard would avoid making eye contact or starting conversations with Mr. Chattha. Mr. Chattha's comments, therefore, always occurred without prompting, while Ms. Gilyard was trying to work.

29. Mr. Chattha called Ms. Gilyard insulting names, like "bitch" and "Black bitch."

30. These comments were degrading and soul-crushing to Ms. Gilyard as a Black woman.

31. Mr. Chattha called Ms. Gilyard and at least one other Black employee many offensive, racially charged slurs, such as "nigger" and "monkey."

32. Early in her time working under Mr. Chattha, Ms. Gilyard was working outside the trailer that serves as an office for the construction site. She overheard Mr. Chattha say from within the trailer, "Them Black Niggers don't work! They're lazy!"

33. Ms. Gilyard was shocked and offended by this comment. She vowed to herself to work hard and show Mr. Chattha that she is not lazy.

34. Mr. Chattha also frequently made comments that implied animus toward Ms. Gilyard's sexual orientation.

35. Since Ms. Gilyard had not disclosed her sexuality to Mr. Chattha, Ms. Gilyard felt that Mr. Chattha had assumed her sexuality by stereotyping her based on her appearance.

36. Ms. Gilyard often interacted with New York City Housing Authority ("NYCHA") employees who performed other jobs at the Gowanus work site. Ms. Gilyard was good friends with one NYCHA employee, Venus Richardson, whom she thought of as a daughter. Once, in Mr. Chattha's presence, Ms. Richardson said to Ms. Gilyard, "Hi Ma!" to which Ms. Gilyard replied, "Hi Daughter!"

37. Mr. Chattha said to them in a rude tone, "That's not your daughter. You're lesbians." Ms. Gilyard was too shocked to speak, and Ms. Richardson uncomfortably laughed it off, saying, "That's my Ma." Ms. Gilyard later told Ms. Richardson that the comment "hurt her heart."

38. After Ms. Richardson left, Mr. Chattha continued to make rude comments implicating Ms. Gilyard's sexual orientation, asking her, "Why don't you have a boyfriend? Why don't you have a husband?"

39. Ms. Gilyard felt that these comments were offensive, inappropriate, and degrading. Mr. Chattha repeated this behavior regularly during their time working in Gowanus.

40. On many other occasions, Mr. Chattha asked Ms. Gilyard more inappropriate questions relating to her sexual orientation, such as, "When's the last time you slept with a man?"

41. Again, these inappropriate, sexual comments offended Ms. Gilyard, as she understood them to be derogatory toward her gender and sexual orientation.

42. Ms. Gilyard is aware of a former Adam's European employee, a woman, who experienced unwanted physical touching by Mr. Chattha.

43. This unwanted physical touching consisted of Mr. Chattha coming up to this employee from behind and pressing his lower body against her body.

44. Dariusz Dodosz, Ms. Gilyard's coworker who had been working for Adam's European since 2009, once witnessed Mr. Chattha call Ms. Gilyard and a few other Black female employees "bitches."

45. Ms. Gilyard and the other female employees had been chatting during their lunch break, and Mr. Dodosz, who had been eating his lunch nearby, saw Mr. Chattha approach the women and yell, "Hey, bitches, break is over, get back to work."

46. Upon witnessing this interaction, Mr. Dodosz was shocked and appalled. He said to Mr. Chattha, "You can't talk to Black women in a Black neighborhood like that." Mr. Chattha did not respond.

47. Later, Mr. Dodosz spoke to Ms. Gilyard to see if she was okay, and Ms. Gilyard told him about Mr. Chattha's derogatory comments, questions, and actions.

48. Mr. Chattha was also verbally abusive to Ms. Gilyard about her work.

49. Mr. Chattha was known by others at the worksite to be particularly cruel and verbally abusive to Ms. Gilyard.

50. Ms. Gilyard frequently cleaned basements at their construction sites. Each basement typically requires about 40 minutes of work.

51. Mr. Chattha would approach Ms. Gilyard after only 10 minutes of work, tower over her in a threatening manner, and scream, "You should have been finished already!" Mr. Chattha would repeat this conduct many times over the course of the 40 minutes during which Ms. Gilyard finished cleaning a basement.

52. Ms. Gilyard often spoke briefly with the electricians working at the Gowanus site in order to ask which basements she should clean next.

53. If Mr. Chattha saw Ms. Gilyard talking to them from the other side of the street, he would scream, "Shut up! Shut up! Get to work!"

54. Mr. Chattha often told Ms. Gilyard to "shut up" even when she was just saying hello to people.

55. Mr. Chattha also said derogatory and insulting things about Ms. Gilyard to other people.

56. On one occasion, Ms. Gilyard was informed by Shanelle Morales, another employee of Adam's European, that Mr. Chattha had been telling her about the kind of things he would say to Ms. Gilyard. Ms. Morales said that Mr. Chattha laughed while relaying this information.

57. Ms. Morales told Ms. Gilyard that she had responded to Mr. Chattha, saying, "You got to stop talking to [Ms. Gilyard] and treating her like that because you're going to cause yourself a lawsuit."

58. Mr. Chattha also made sexual comments about Ms. Gilyard to other people.

59. A temporary pipe worker, known to Ms. Gilyard as Ralph, once informed her that Mr. Chattha had told him that Ms. Gilyard "gives good blowjobs."

60. Ralph said that the comment had upset and offended him, which is why he told Ms. Gilyard about it.

6

61. Other female coworkers informed Ms. Gilyard on many occasions that Mr. Chattha would often say to them, "Stay away from her [Ms. Gilyard]. She wants you." Ms. Gilyard was very upset by these comments, as they painted her as a predator because she is a lesbian.

62. Mr. Chattha also made inappropriate comments about other workers to Ms. Gilyard.

63. One time, in late 2019 or early 2020, another female employee of Adam's European, Shaniqua Webb, was involved in an accident in which a forklift crushed part of her leg and torso.

64. Ms. Gilyard was friends with Ms. Webb and visited her frequently in the hospital.

65. In reference to Ms. Webb, Mr. Chattha said to Ms. Gilyard, on multiple occasions, "Your friend has a new vagina."

66. Ms. Gilyard was shocked by these unsolicited comments and felt that she was being targeted with these sexual comments about another woman because she is a lesbian.

67. Mr. Chattha also gave Ms. Gilyard tasks that were unpleasant and outside her job description.

68. On one occasion, a NYCHA Grounds Worker known to Ms. Gilyard as Wendy informed Mr. Chattha that someone had left diarrhea in a toilet and on the floor in a bathroom. Wendy was complaining out loud about someone creating the mess. Ms. Gilyard was cleaning some drilling dust in the same building at the time.

69. Mr. Chattha ordered Ms. Gilyard to clean the bathroom.

70. Cleaning the bathrooms is a task done by NYCHA employees.

71. Wendy stated that it was her job to clean the bathroom, but Mr. Chattha responded by again telling Ms. Gilyard to "clean it."

72. Ms. Gilyard proceeded to clean the bathroom.

73. Ms. Gilyard found this work to be incredibly demeaning and felt that it demonstrated Mr. Chattha's strong and unfounded dislike and disrespect for her.

74. On another occasion, Mr. Chattha ordered Ms. Gilyard to clean all the grounds around a particular building, even though that was also a job done by NYCHA employees.

7

75. Wendy heard this interaction and said to Mr. Chattha, "No, that's my work. Those are my grounds. Leave Shirley alone. She does enough here. She works hard."

76. Mr. Chattha told Ms. Gilyard to clean it anyway.

77. Ms. Gilyard then cleaned the area.

78. Mr. Chattha even gave Ms. Gilyard tasks that were dangerous and against safety regulations.

79. He once ordered Ms. Gilyard to clean in the enclosure underneath a scaffold on which other employees were working.

80. Mr. Dodosz, who was working on the scaffold, saw Ms. Gilyard enter the area below, where items, particularly bricks, are likely to fall.

81. Mr. Dodosz yelled out to her, telling her to move because it is incredibly dangerous to stand in the enclosure.

82. Mr. Chattha, despite knowing the safety risks, still ordered Ms. Gilyard to clean in the enclosure.

83. Mr. Chattha acted abusively, demeaningly, and inappropriately toward Ms. Gilyard continuously throughout the next year and a half until March of 2020.

84. This resulted in months of stress, anxiety, and emotional distress for Ms. Gilyard.

*Events at the Gowanus Housing Work Site, March 20, 2020*

85. All of these events led up to a day on which several incidents occurred that hurt Ms. Gilyard significantly.

86. On or about March 20, 2020, Ms. Gilyard was performing her usual tasks when Mr. Chattha yelled at her, unprompted, "I'm gonna fire you!"

87. Ms. Gilyard tried to ignore this comment but was very upset by it.

88. Later that day, Ms. Gilyard was putting bricks in wheelbarrows and left the wheelbarrows momentarily to go inside to use the bathroom.

89. When she returned, Mr. Chattha screamed at her twice, "You stupid, lazy bum!"

8

90. There were multiple school crossing guards nearby, and they all froze when they heard this but did not say anything. The atmosphere immediately became silent and tense following Mr. Chattha's screaming.

91. Right after this incident occurred, Mimi Perez, an employee of Adam's European, approached Ms. Gilyard. Ms. Perez asked Ms. Gilyard if she would come into one of the trailers and talk to Mr. Chattha.

92. Ms. Gilyard was still shaken from the incident and did not want to speak to Mr. Chattha. She told Ms. Perez that she did not want to do so.

93. Shortly after, Ms. Gilyard's longtime friend and neighbor, Anthony Pina, approached her.

94. Mr. Pina told Ms. Gilyard that he had heard how Mr. Chattha spoke to her and had been so shocked and upset by the comment that he felt he needed to confront Mr. Chattha.

95. Mr. Pina told Ms. Gilyard that he had approached Mr. Chattha and said words to the effect of, "You don't talk to NO woman like that! And you need to apologize to her!"

96. Mr. Pina did not work for Adam's European, but he was familiar with many of the employees, including Mr. Chattha, because he lived in Gowanus Housing, where Ms. Gilyard and Mr. Chattha had been working.

97. Mr. Chattha's insult deeply upset Ms. Gilyard, and she still becomes emotional today when she thinks about it. Mr. Chattha's harsh words, "stupid lazy bum," continue to haunt her and echo in her mind. By using these words, Mr. Chattha made her feel like a slave.

98. Later that day, Mr. Chattha approached Ms. Gilyard and said he was sorry. He then stated, "Nothing is going to happen to me anyway," indicating that he expected no consequences from Adams European for his behavior. Ms. Gilyard inferred from the tone of the so-called apology and from his subsequent statement that Mr. Chattha only said he was sorry because Mr. Pina told him to and that the apology was insincere. Mr. Chattha also did nothing to alter his behavior after apologizing.

99. At some point during the day, Ms. Gilyard called Kareem to tell him what had happened. Kareem is the person who had advised her of the job opportunity, interviewed her, and set her up on her first day at Adam's European. Ms. Gilyard felt that he might be able to help her.

100. News of the incident made its way to Angelo, another supervisor who worked for Adam's European at the Gowanus worksite site.

101. On the evening of March 20, 2020, Ms. Gilyard received a call from Angelo, who told her that Adam's European was going to transfer her to a new work site in Red Hook.

102. Angelo told Ms. Gilyard that since the Gowanus project was scheduled to be completed in a few weeks, Ms. Gilyard was "going to be sent to Red Hook then anyway."

*Events at the Red Hook Work Site, March 2020 - January 2021*

103. Ms. Gilyard started to work at the Red Hook work site within a few days.

104. While Ms. Gilyard had preferred the Gowanus site because it was her home, she was glad to have a reprieve from Mr. Chattha's constant abuse.

105. Unfortunately, her reprieve was short-lived, because Adam's European also sent Mr. Chattha to the Red Hook site as scheduled a few weeks later when the Gowanus job was complete.

106. Mr. Chattha was no longer Ms. Gilyard's direct supervisor, but his derogatory and inappropriate comments continued whenever he encountered Ms. Gilyard on the site. This made Ms. Gilyard feel like nothing she did would ever stop Mr. Chattha from treating her so poorly.

107. Not long after Mr. Chattha started working at the Red Hook location, he once again brought up Ms. Webb's forklift accident, again saying to Ms. Gilyard, "Your friend has a new vagina."

108. Ms. Gilyard tried to ignore him but felt despair since nothing had changed since her transfer to Red Hook.

109. At one point, while on the site in Red Hook, Mr. Chattha said to Ms. Gilyard in an accusatory fashion, "Did you tell anyone?" Ms. Gilyard did not answer him and tried to keep working. She could tell that he was referring to the way that he had been treating her.

110. Ms. Gilyard did not know if he had found out that she had been transferred because of the March 20, 2020 incident, but she suspected that he had.

111. After this incident, Mr. Chattha ceased his explicit verbal abuse and began instead to glare threateningly at Ms. Gilyard whenever he saw her, often appearing as though he was about to yell at her.

112. Ms. Gilyard interpreted this change in Mr. Chattha as being a result of him finding out that she had complained about him.

113. For the next several months, Mr. Chattha engaged in less overt behavior. While he no longer verbally abused Ms. Gilyard, Mr. Chattha would frequently stare menacingly at her or stop and stand silently over Ms. Gilyard when she was trying to work.

114. Once, Ms. Gilyard was walking toward Mr. Chattha, who was speaking to two other men who were visiting the worksite.  As she came closer to them, the two visitors then turned toward Ms. Gilyard, and all three men glared at her as if they had just been talking about her. Ms. Gilyard felt that their expressions implied that they wanted to physically harm her.

*Events at the Red Hook Work Site, January 2021 - February 2021*

115. Sometime in January 2021, Ms. Gilyard was receiving her daily safety training from an OSHA compliance employee known to her as Rasheed. These safety trainings happened every morning, with a safety compliance employee rounding up the workers and giving them instructions and reminders for safety on the job.

116. Sometimes, Rasheed's boss, Amani Murphy, would make an appearance and speak to the employees. That day, Mr. Murphy showed up and said a few words about sexual harassment.

117. Ms. Gilyard finally felt like someone might understand and be sympathetic to what had been happening to her.

118. Later that day, Ms. Gilyard went to speak to Mr. Murphy in a small office at the site.

119. Ms. Gilyard described Mr. Chattha's conduct to Mr. Murphy and became emotional, starting to cry.

120. Mr. Murphy told Ms. Gilyard, "We're going to get to the bottom of this."

121. A few days later, Rasheed approached Ms. Gilyard and told her that she was needed for a meeting over Zoom. When Ms. Gilyard followed him, he brought her to his car.

122. Ms. Gilyard was confused but got in the car, where Eduardo Reluzco, the Safety Director of Adam's European, and Adam's European's lawyer were not physically present but on Zoom audio over the car's speakerphone.

123. The lawyer and Mr. Reluzco introduced themselves and began asking Ms. Gilyard questions.

124. The odd nature of the meeting in the car over Zoom made Ms. Gilyard uncomfortable. She also felt that the lawyer for Adam's European was asking her questions that they should have already known or could have easily found out from company records, such as, "How old are you?" and "What does your job entail?"

125. When Adam's European's lawyer spoke about Ms. Gilyard's job, she got the sense that the lawyer felt that they were doing her a favor by letting her work on the grounds, despite her having trained to be a roofer, and that she should be grateful to be employed at all.

126. This was very upsetting to Ms. Gilyard, and she said that she was overwhelmed and excused herself from the car.

127. A week later, Rasheed brought Ms. Gilyard into another meeting in his car. The same participants were on another Zoom call, and they asked Ms. Gilyard, "What do you want?"

128. Ms. Gilyard stated that she again felt overwhelmed by this situation and promptly left the vehicle. She felt that their tone was accusatory, and she inferred from the nature of their questioning that they were trying to get her to admit to something that they could use against her.

129. A few days later, Dennis Penny, Adam's European's Time Sheet Manager, approached Ms. Gilyard. He asked Ms. Gilyard to come to the office and sign a memorandum produced by Adam's European's lawyer, dated February 10, 2021.

130. Ms. Gilyard took the memorandum with her because she did not have her reading glasses.

131. The memorandum detailed Ms. Gilyard's complaints about Mr. Chattha and implied that Adam's European had rectified the situation by transferring her to Red Hook.

132. Ms. Gilyard did not sign it because it contained many factual inaccuracies, including a statement that the harassment had ceased when Adam's European transferred Ms. Gilyard to Red Hook, which it had not.

133. After this incident, Mr. Chattha continued to stare menacingly at her whenever they were on site together.

134. Though Mr. Chattha's verbal harassment had ceased, his constant threatening stares made Ms. Gilyard scared that he could start screaming at her at any moment.

*Negative Effects on Ms. Gilyard*

135. Since she started working for Adam's European in 2018, Ms. Gilyard has suffered severe emotional distress because of Mr. Chattha's abusive words and actions. Because Mr. Chattha was her supervisor, she felt powerless to stop him. That she was eventually transferred and still not able to escape Mr. Chattha's abuse made her feel even more helpless.

136. Ms. Gilyard would physically hide behind coworkers as she clocked into work in an effort to avoid being seen by Mr. Chattha. She was afraid of what he might say to her.

137. As a result of Mr. Chattha's comments about her sexual orientation, Ms. Gilyard has chosen not to use the shared changing trailer with the other women at her worksite. Mr. Chattha's comments that implied that she was a predator have made her too uncomfortable to enter the changing room.

138. Ms. Gilyard's anxiety and fear of Mr. Chattha's comments sometimes made her feel unable to get out of bed and go to work, as she dreaded facing him and taking his abuse.

139. Ms. Gilyard found Mr. Chattha's conduct to be demeaning and insulting to her race, gender, and sexual orientation. Ms. Gilyard felt like Mr. Chattha had taken her soul from her. Often, Ms.

Gilyard was so sad about the mistreatment she experienced that she could barely get out of bed and out the door in the morning.

140. Because Ms. Gilyard is a Black woman, Mr. Chattha's use of racially charged slurs was terribly degrading. This abusive behavior that Ms. Gilyard experienced was a powerful reminder of her ancestors' experience of slavery.

141. Ms. Gilyard called out of work on multiple days because she was incapable of seeing Mr. Chattha without becoming distressed. At times, Ms. Gilyard has opted to lose out on a day's wages so that she did not have to experience the distress and anguish of interacting with Mr. Chattha.

142. If Ms. Gilyard calls out sick, she does not get paid for that day.

143. Ms. Gilyard's loss of income has made it a struggle for her to pay rent.

144. Because of Mr. Chattha's conduct, Ms. Gilyard has experienced difficulty sleeping, vivid nightmares, panic attacks, chest pains, weight loss, and hair loss. The stress has made it difficult to maintain the upkeep of her home.

145. Ms. Gilyard, who previously drank alcohol socially on weekends only, started having a drink daily in an effort to ease her anxiety and improve her ability to fall asleep.

146. Ms. Gilyard continues to experience anxiety and stress on a daily basis as she still must see Mr. Chattha at work every day. He continues to stare at her in a menacing and threatening way, causing Ms. Gilyard extreme anxiety and fear that he will resume his past verbal harassment.

147. Ms. Gilyard has never been treated this way in any of her previous places of employment.

CAUSES OF ACTION

FIRST CAUSE OF ACTION
DISCRIMINATION IN VIOLATION OF THE CRA
(Against Defendant Adam's European Contracting, Inc.)

148. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 147, as if fully set forth herein.

149. As a Black woman, Plaintiff was and is a member of the protected class under the Civil Rights Act of 1866.

150. By the actions described above, Defendant Adam's European intentionally and unlawfully harassed and discriminated against Plaintiff on the basis of her race in violation of the Civil Rights Act of 1866.

151. As a direct and proximate result of Defendant Adam's European's unlawful and discriminatory conduct in violation of the Civil Rights Law of 1866, Plaintiff has suffered and continues to suffer harm, including mental anguish, emotional distress, and loss of enjoyment of life, for which she is entitled to an award of monetary damages and other relief.

SECOND CAUSE OF ACTION
DISCRIMINATION IN VIOLATION OF TITLE VII
(Against Defendant Adam's European Contracting, Inc.)

152. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 147, as if fully set forth herein.

153. As a Black lesbian woman, Plaintiff was and is a member of protected groups under Title VII.

154. By the actions described above, Defendant Adam's European, through its agents, discriminated against Plaintiff on the basis of her race and sex in violation of Title VII, subjecting Plaintiff to a hostile work environment on the basis of her membership in protected classes.

155. As a direct and proximate result of Defendant Adam's European's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer damages, including mental anguish, emotional distress, debilitating anxiety, decreased physical health, and loss of enjoyment of life for which she is entitled to an award of monetary damages and other relief.

156. Defendant Adam's European's unlawful and discriminatory actions constitute violations of Title VII for which Plaintiff is entitled to an award of punitive damages, declaratory and injunctive relief, attorneys' fees, and any other such relief as the Court deems just and proper.

### THIRD CAUSE OF ACTION
### DISCRIMINATION IN VIOLATION OF THE NYSHRL
(Against All Defendants)

157. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 147, as if fully set forth herein.

158. As a Black lesbian woman, Plaintiff was and is a member of protected groups under the NYSHRL.

159. By the actions described above, Defendants created a hostile work environment constituting discrimination on the basis of her race, gender, and sexual orientation in violation of the NYSHRL.

160. Defendant Adam's European knew or should have known about the discriminatory conduct of Defendant Ejaz Chattha, and they encouraged, condoned, and/or approved of such discriminatory conduct.

161. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer harm, including mental anguish, emotional distress, and loss of enjoyment of life, for which she is entitled to an award of monetary damages and other relief.

### FOURTH CAUSE OF ACTION
### DISCRIMINATION IN VIOLATION OF THE NYCHRL
(Against All Defendants)

162. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 147, as if fully set forth herein.

163. As a Black lesbian woman, Plaintiff was and is a member of protected groups under the NYCHRL.

164. By the actions described above, Defendants discriminated against Plaintiff on the basis of her race, gender, and sexual orientation in violation of the NYCHRL by denying her equal terms and conditions of employment, including but not limited to, subjecting her to disparate working conditions and denying her the opportunity to work in an employment setting free of unlawful harassment.

165. Defendants have discriminated against Plaintiff on the basis of her race, gnder, and sexual orientation in violation of the NYCHRL by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment.

166. Defendant Adam's European knew or should have known about the discriminatory conduct of Defendant Ejaz Chattha, and they acquiesced in such conduct, failed to take immediate and appropriate corrective action, and/or failed to exercise reasonable diligence to prevent such conduct.

167. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYCHRL, Plaintiff has suffered and continues to suffer damages, including mental anguish, emotional distress, debilitating anxiety, decreased physical health, and loss of enjoyment of life for which she is entitled to an award of monetary damages and other relief.

168. Defendants' unlawful and discriminatory actions constitute violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages, declaratory and injunctive relief, attorneys' fees, and any other such relief as the Court deems just and proper.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

169. A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the United States, the State of New York, and the City of New York;

170. An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees, and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and/or practices complained of herein;

171. An award of damages against Defendants in an amount to be determined at trial, plus interest, to compensate for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, and other benefits of employment;

17

172. An award of damages against Defendant in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including but not limited to, compensation for Plaintiff's mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

173. An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, earned bonus pay, reputational harm, and harm to professional reputation, in an amount to be determined at trial, plus interest;

174. An award of punitive damages in an amount to be determined at trial;

175. Prejudgment interest on all amounts due;

176. An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

177. Such other and further relief as the Court may deem just and proper.

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, punitive damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated: 1/20/2023
New York, New York

> LISA RIVERA, ESQ.
> New York Legal Assistance Group
> 100 Pearl Street, 19th Floor
> New York, New York 10004
> Tel: (212) 613-5033
>
> _____
> Adena L. Wayne, of Counsel
>
> *Attorney for Plaintiff*
>
> ____/s/ Susan Hazeldean_____
> SUSAN HAZELDEAN, ESQ.
> BLS Legal Services Corp.,

18

Brooklyn Law School
250 Joralemon Street
Brooklyn, NY 11201
Tel: (718) 780-7575

*Attorney for Plaintiff*